Je Yon Jung, Esq. (SBN #329774)
**May Jung, LLP**
333 City Blvd. West
Suite 327
Orange, CA 92868
(818) 869-6476
jeyon@mayjung.com

*Attorney for Plaintiffs*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SUMOYYAH LEE, individually and as successor-in-interest; ERICK J. LEE, individually and as successor-in-interest, | CASE NO. |
| Plaintiffs, | **COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF** |
| vs. | **42 U.S.C. 1983: FOURTEENTH AMENDMENT, FIRST AMENDMENT, FEDERAL ADOPTION ASSISTANCE ACT AND CHILD WELFARE ACT, FAILURE TO TRAIN, AND FAILURE TO SUPERVISE** |
| COUNTY OF LOS ANGELES; LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES ("DCFS"); BRANDON T. NICHOLS, Director of DCFS; LLANET "LILY" ACOSTA, social worker at DCFS; LESLIE GOWDY, social worker at DCFS, and DOES 1 through 50, inclusive, | **STATE AND COMMON LAW: CONSTITUTION, NEGLIGENCE, INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS, WRONGFUL DEATH, AND PUBLIC RECORDS ACT** |
| Defendants. | |

## I.     INTRODUCTION

**COME NOW** Plaintiffs SUMOYYAH LEE and ERICK J. LEE,

individually and as successors-in-interest (collectively "Plaintiffs"), who allege

upon information and belief as follows.

Plaintiffs' son, Erick A. Lee ("Baby Erick"), was born on March 11, 2022. Baby Erick was born prematurely at 26 weeks and 3 days. At the time of birth, he weighed 945 grams, or 2.083 pounds. Baby Erick spent the first several months in the Neonatal Intensive Care Unit ("NICU"). On June 28, 2022, Baby Erick was discharged from the NICU into the custody of Los Angeles County, Department of Children and Family Services ("DCFS") and placed with a DCFS resource parent, Margaret Nsubuga (aka Margaret Kayiiri). DCFS did not give prior notice to Plaintiffs regarding their baby's discharge from the NICU or his placement with a DCFS' resource parent for over 24 hours. Baby Erick was in DCFS custody and care for approximately 101 days, during which he was admitted to the emergency room and hospital no fewer than three times for severe or critical dehydration due to inadequate feeding. Baby Erick died on October 7, 2022, due to severe dehydration, and at the time of death had adult sleeping medication in his system. DCFS did not notify Plaintiffs that their baby had died for more than 24 hours.

This is a complaint for damages and declaratory and injunctive relief based on violations of federal and state constitutional rights, federal and state statutory rights, and common law violations committed by LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES; BRANDON T. NICHOLS, Director of the Department of Children and Family Services; LLANET

"LILY" ACOSTA, Department of Children and Family Services social worker;

LESLIE GOWDY, Department of Children and Family Services social worker;

and DOEs 1-50 inclusive.

## II.  JURISDICTION

1.      Plaintiffs bring this case pursuant to 42 U.S.C. §§ 1983, 1988, and

California's Constitution and state law. Jurisdiction is based on 28 U.S.C.

§§ 1331, 1343 (1-4). Supplemental jurisdiction exists over the state claims and

Defendants pursuant to 28 U.S.C. §1367.

2.      Plaintiffs have fully satisfied the Tort Claims Act as to California state

law claims made herein.

## III.  VENUE

3.      The claims alleged herein arose from events or omissions that

occurred in the County of Los Angeles. Therefore, venue lies in the Central

District of California pursuant to 28 U.S.C. § 1391(b)(2).

## IV.  PARTIES

### A.    Plaintiffs

4.      Plaintiff SUMOYYAH LEE is a resident of the State of California. At

all times material to this Complaint, SUMOYYAH LEE was a private citizen of

the State of California, United States of America. SUMOYYAH LEE is the

biological mother of Erick A. Lee ("Baby Erick"), who was born on March 11, 2022, and died on October 7, 2022.

5.      Plaintiff ERICK J. LEE is a resident of the State of California. At all times material to this Complaint, ERICK J. LEE was a private citizen of the State of California, United States of America. ERICK J. LEE is the biological father of Baby Erick, who was born on March 11, 2022, and died on October 7, 2022.

**B.      Defendants**

6.      Defendant COUNTY OF LOS ANGELES ("County") is a municipality in the State of California.

7.      LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES ("DCFS") is an agency of the COUNTY OF LOS ANGELES. DCFS' mission is to "promote child safety and well-being by partnering with communities to strengthen families, keeping children at home whenever possible, and connecting them with stable, loving homes in times of need."

8.      Defendant BRANDON T. NICHOLS is the Director of DCFS and, at all times material herein, a policymaker and/or supervisor and acting under color of law within the course and scope of his employment. NICHOLS is sued herein in his official capacity.

9.     LLANET "LILY" ACOSTA is a social worker at DCFS and, at all times, material herein was the assigned and responsible social worker for Baby Erick's custody and care, until on or about September 21, 2022. ACOSTA is sued herein in her individual and official capacity.

10.     LESLIE GOWDY is a social worker at DCFS and, at all times material herein, was the assigned and responsible social worker for Baby Erick's custody and care, from approximately September 21, 2022, until the date of his death. GOWDY is sued herein in his individual and official capacity.

11.     Each DOE Defendant 1 through 50 is a policymaker, supervisor, manager, employee, or agent at DCFS, and, at all times material herein, was responsible for Baby Erick's custody and care. Plaintiffs are informed, believe, and thereupon allege that there is likely to be evidentiary support to prove that each DOE Defendant was involved in some manner and legally responsible for the acts and/or omissions alleged below. Plaintiffs will amend the Complaint to name the DOE Defendants upon learning their true identities and roles in the actions complained of herein.

12.     Defendants COUNTY and/or DCFS, is the employer of individually named Defendants including, but not limited to, those who are sued in their

individual and official capacities, as well as one, or all, of Defendant DOEs 1 through 50.

13.     All the facts, acts, omissions, events, and circumstances herein mentioned and described took place in the County of Los Angeles, State of California, and, upon information and belief, each Defendant is a municipality, resident or place of business in the County of Los Angeles, State of California.

14.     Plaintiffs are informed, believe, and thereupon allege that Defendants employed by Defendants COUNTY and DCFS were, at all times relevant and material to this Complaint, acting within the course and scope of their employment duties for Defendants COUNTY and DCFS, and under color of law.  Plaintiffs are informed, believe, and thereupon allege that each of the individual Defendant's acts was known to, discovered by, approved by, and/or ratified by Defendant COUNTY and DCFS, by and through their policymakers, decision makers, officials, officers, and/or supervisors, including named Defendants, and applicable DOE Defendants.

15.     Plaintiffs are informed, believe, and thereupon allege that officials, supervisors, policymakers, and other individuals with the authority to set or modify municipal and/or departmental policy, *de jure* or *de facto,* of Defendants CDSS, COUNTY, and/or DCFS participated in, approved of,

ratified, and/or failed to prevent the acts by all Defendants and DOE Defendants of which Plaintiffs complain herein.

16.     Defendants are referred to collectively at times herein as "DEFENDANTS."

## V.     FACTS COMMON TO ALL CLAIMS FOR RELIEF

**A. Defendants' Custody of Baby Erick.**

17.     In 2020, Plaintiff SUMOYYAH LEE was involved in a domestic violence incident with Plaintiff ERICK J. LEE.

18.     As a result of the domestic violence incident, Defendant DCFS intervened and removed Plaintiff SUMOYYAH LEE's two minor daughters from her home and placed them with their biological father, who is not Plaintiff ERICK J. LEE.

19.     Plaintiff SUMOYYAH LEE gave birth to Erick A. Lee ("Baby Erick") on March 11, 2022, at Antelope Valley Hospital in Lancaster, California.

20.     Plaintiff ERICK J. LEE is the biological father of Baby Erick.

21.     By the time Baby Erick was born, Plaintiffs SUMOYYAH LEE and ERICK J. LEE were no longer together and Plaintiff SUMOYYAH LEE and Plaintiff ERICK J. LEE did not reside together.

22.     Baby Erick was born prematurely at 26 weeks and 3 days. At the time of birth, he weighed 945 grams, or 2.083 pounds.

23.     Due to his prematurity, Baby Erick was placed into the Antelope Valley Hospital NICU.



24.     Plaintiff SUMOYYAH LEE visited Baby Erick every day that he was in the Antelope Valley Hospital NICU ("AVH NICU").

25.     Plaintiff ERICK J. LEE visited Baby Erick on the day he was born, as well as several other times while he was in the AVH NICU.

26.     Shortly after Baby Erick was born, he developed and was diagnosed with necrotizing enterocolitis and short gut syndrome.

27.     On or about April 9, 2022, Baby Erick was transferred to the NICU at Children's Hospital at UCLA in Los Angeles ("UCLA NICU").

28.     While in the UCLA NICU, Baby Erick had a number of surgeries, including the creation of an ileostomy on April 10, 2022; lysis of adhesions with

6cm small bowel resection and ileostomy closure on May 20, 2022; and a repeat lysis of adhesions, small bowel resection and end ileostomy creation on June 3, 2022.

29. On or about May 4, 2022, Defendants removed Baby Erick from Plaintiff SUMOYYAH LEE's custody and care, based on the prior domestic violence incident from 2020.

30. Although Plaintiff SUMOYYAH LEE had never been accused of neglecting or abusing any of her children and she was no longer in a relationship with or living with Plaintiff ERICK J. LEE, Defendants nevertheless sought and obtained the custody and care of Baby Erick on or about May 4, 2022.

31. Baby Erick was still in the UCLA NICU at this time.

32. As a result of DCFS taking custody of Baby Erick in May 2022, Plaintiff SUMOYYAH LEE was subsequently required to have her visits with her newborn baby in the UCLA NICU supervised by Defendants.

**B. Defendants Failed to Provide Required Preferential Treatment to Relatives.**

33. As soon as the determination was made to place Baby Erick in DCFS custody in May 2022, Plaintiff SUMOYYAH LEE immediately identified and provided the names of several family members, including Plaintiff SUMOYYAH LEE's brother, Michael Irving, and aunt, Patricia Willis, to Defendant ACOSTA

who were both willing to serve as the foster parent for Baby Erick upon his release from the UCLA NICU.

34.    On multiple occasions throughout May and June, including, but not limited to May 24, May 25, May 31, and June 28, Plaintiff SUMOYYAH LEE inquired and followed up with Defendant ACOSTA via text and telephone about the status of approval for her relatives.

35.    Defendant ACOSTA either ignored Plaintiff SUMOYYAH LEE's inquiries or represented that she was still working on the approvals.

36.    Throughout May and June 2022, Plaintiff SUMOYYAH LEE's visits with Baby Erick were less frequent because her visits had to be supervised by DCFS, the hospital was 2.5 hours from her home, and/or she had returned to work. However, Plaintiff SUMOYYAH LEE called nearly every day to the UCLA NICU to have video "facetime" with Baby Erick and/or to get an update on his status from the UCLA NICU nurses.

37.    UCLA NICU nurses and personnel met with DCFS resource parent Nsubuga on June 27, 2022, regarding discharge instructions and a care plan for Baby Erick.

38.    Baby Erick was discharged from the UCLA NICU to DCFS custody on June 28, 2022, at approximately 2:00 p.m.

39.    At the time of discharge, Baby Erick weighed 7.07 pounds.

40.    DCFS immediately placed Baby Erick with DCFS resource parent Nsubuga.

41.    DCFS did not provide notice to Plaintiffs that their baby was going to be discharged from the UCLA NICU on June 27 or 28, 2022.

42.    DCFS did not provide notice to Plaintiffs that their baby was going to be placed with DCFS resource parent Nsubuga prior to DCFS placement.

43.    Plaintiff SUMOYYAH LEE discovered that her baby was discharged when she called the UCLA NICU on the evening of June 28, 2022, as she routinely did every evening after she returned home from work. She was informed by a UCLA NICU nurse of Baby Erick's discharge earlier that day.

44.    Throughout May and June 2022, and even up to the day of Baby Erick's UCLA NICU discharge on June 28, 2022, Plaintiff SUMOYYAH LEE was informed and believed, based on Defendant ACOSTA's communications, that her family members were undergoing approval and authorization for Baby Erick's placement post-discharge.

45.    After learning of Baby Erick's discharge from the UCLA NICU nurse, Plaintiff SUMOYYAH LEE immediately called her assigned DCFS social worker, Defendant ACOSTA, who did not answer. She then called the DCFS

hotline, and the hotline attendant informed Plaintiff SUMOYYAH LEE that Defendant ACOSTA was supposed to have called to inform her about the discharge.

46.     Desperate for answers regarding the whereabouts of her newborn baby, Plaintiff SUMOYYAH LEE texted Defendant ACOSTA at 10:30 p.m. on June 28, 2022, pleading for her to call her back.

47.     Defendant ACOSTA did not respond to Plaintiff SUMOYYAH LEE's text or return her call.

48.     The next morning, Defendant ACOSTA sent a text to PLAINITFF SUMOYYAH LEE, stating "Gm. I will call you after 10 am."

49.     Nearly 24 hours after Baby Erick was discharged from the NICU and DCFS took physical custody of him, DCFS had still not provided Plaintiffs with any information regarding their newborn baby's placement with DCFS.

50.     Later that day, June 29, 2022, Plaintiff SUMOYYAH LEE again texted Defendant ACOSTA asking about her baby's status, and informed Defendant ACOSTA that medical supplies for Baby Erick had been sent to her home. Defendant ACOSTA responded that she would pick up the medical supplies from Plaintiff SUMOYYAH LEE the next day and the message "I'm still going to call u."

51.    Plaintiff SUMOYYAH LEE responded "I am very concerned about Erick I was not informed by you or anyone else from dcfs about him being released from the hospital and being placed with a foster family yesterday."

52.    Over four hours later, Defendant ACOSTA texted DCFS resource parent Nsubuga's phone number to Plaintiff SUMOYYAH LEE and stated "Margaret is the resource parent[,]" but did not otherwise substantively respond to Plaintiff SUMOYYAH LEE'S concern expressed in the text message or return Plaintiff SUMOYYAH LEE'S June 28th call.

53.    Forty-eight hours after Baby Erick's discharge into DCFS custody, on June 30, 2022, around 4:00 p.m. while picking up Baby Erick's medical supplies from Plaintiff SUMOYYAH LEE, Defendant ACOSTA claimed that Baby Erick's discharge "happened so fast," and she was unable to provide prior notice and information to Plaintiffs. Further, Defendant ACOSTA claimed that due to Baby Erick's special medical needs, he was required to be placed with DCFS resource parent Nsubuga, who is a registered nurse.

54.    Defendant ACOSTA informed Plaintiff SUMOYYAH LEE for the first time on June 30, 2022, that Baby Erick could not be placed with her brother,

Michael Irving, even though he was certified, because he was not F-rate certified.[1] This was the first time that DCFS or Defendant ACOSTA informed Plaintiff SUMOYYAH LEE of this purported requirement.

55.     On July 1, 2022, Plaintiff SUMOYYAH LEE provided Defendant ACOSTA with confirmation that her aunt, Patricia Willis, is an F-rate certified DCFS resource parent. Defendant ACOSTA ignored this information.

56.     Plaintiff SUMOYYAH LEE followed up with Defendant ACOSTA on multiple additional occasions throughout July, including text messages on July 11 and July 28, 2022, when Plaintiff SUMOYYAH LEE forwarded a copy of Mr. Michael Irving's F-rate certification to Defendant ACOSTA. Defendant ACOSTA never responded.

57.     Throughout the time that DCFS placed Baby Erick with DCFS resource parent Nsubuga, Plaintiff SUMOYYAH LEE had a number of difficulties coordinating with DCFS to provide someone to monitor her supervised visits.

58.     On multiple occasions in June and July, Plaintiff SUMOYYAH LEE requested that her brother Michael Irving, who was already certified, be approved to monitor her supervised visits with Baby Erick.

---

[1] The F-rating is a specialized certification for resource parents to obtain in order to foster children with special medical needs.

COMPLAINT
PAGE 14

59.    On or about July 19, 2022, Defendant ACOSTA approved Michael Irving to monitor Plaintiff SUMOYYAH LEE's supervised visits with Baby Erick. DCFS resource parent Nsubuga's husband dropped Baby Erick off to Plaintiff SUMOYYAH LEE and Michael Irving that day.

60.    In July, Plaintiff SUMOYYAH LEE also requested that her sister Kiersten Irving be approved to monitor her supervised visits with Baby Erick. DCFS ignored these requests and never initiated this process.

61.    On or about August 16, 2022, Defendant ACOSTA informed Plaintiff SUMOYYAH LEE that Baby Erick was being transferred to the "medical fragile unit."[2] At that point in time, this premature, newborn baby with special medical needs had been in DCFS custody for over 90 days and in DCFS placement with DCFS resource parent Nsubuga—over Plaintiffs' family members—for nearly 60 days since discharge from the NICU, and yet had not been transferred to the MCMS unit of DCFS.

62.    Plaintiff SUMOYYAH LEE followed up with Defendant ACOSTA on multiple additional occasions throughout August regarding the status of her F-

---

[2] This is also known as the DCFS Medical Case Management Services ("MCMS") unit.

rate certified family members' approval to foster Baby Erick and/or monitor her supervised visits with Baby Erick. Defendant ACOSTA did not respond.

63.    Plaintiff SUMOYYAH LEE sought DCFS' approval of her family members to at least be approved as monitors as soon as possible because she frequently was denied visitation with Baby Erick due to a lack of a monitor for her supervised visits. For example, on Wednesday, August 31, 2022, Plaintiff SUMOYYAH LEE texted DCFS resource parent Nsubuga to request to see Baby Erick on the following Sunday, September 4, 2022—her only day off from work.

64.    DCFS resource parent Nsubuga denied Plaintiff SUMOYYAH LEE's visit request and stated that Sunday is "family day" and that she would not supervise Plaintiff SUMOYYAH LEE's visit with Baby Erick.

65.    DCFS resource parent Nsubuga told Plaintiff SUMOYYAH LEE that she would only monitor one visit a week and that SUMOYYAH LEE would have to coordinate with Defendants and Defendant ACOSTA for any other monitored visits.

66.    When Plaintiff SUMOYYAH LEE reminded DCFS resource parent Nsubuga that her brother Michael Irving had previously been authorized by Defendant ACOSTA to monitor her visits with Baby Erick back on July 19—(a visit at which DCFS resource parent's husband had dropped Baby Erick), without

justification DCFS resource parent Nsubuga requested yet another confirmation from Defendant ACOSTA.

67.     On September 2, 2022, Plaintiff SUMOYYAH LEE sent a group text to DCFS resource parent Nsubuga and Defendant ACOSTA to request Defendant ACOSTA confirm in the group text once again that Michael Irving was authorized to monitor Baby Erick's visit with Plaintiff SUMOYYAH LEE.

68.     Defendant ACOSTA never responded and DCFS resource parent Nsubuga refused to allow Plaintiff SUMOYYAH LEE's visit with Baby Erick to go forward.

69.     On September 7, 2022, Plaintiff SUMOYYAH LEE again requested the status of the Defendants' review and approval of her family members' certifications to become Baby Erick's resource parents and whether her brother Michael Irving could at least be (re)approved for monitoring her supervised visits with Baby Erick. Defendant ACOSTA did not respond to these requests.

70.     On September 7, 2022, Plaintiff SUMOYYAH LEE again requested from Defendant ACOSTA the status of the new social worker and Michael Irving's status as monitor.

71.     On September 9, 2022, while Plaintiff SUMOYYAH LEE was visiting Baby Erick during one of his hospitalizations, Defendant ACOSTA asked

Plaintiff SUMOYYAH LEE to sign a largely incomplete Child and Family Team ("CFT") case plan and Defendant ACOSTA stated that she would complete it later and send her a copy.[3]

72.    The CFT case plan is statutorily required to be developed within a maximum of 60 days of the initial removal of a child or by the date of the dispositional hearing, whichever comes first. Cal. Welf. & Inst. Code § 16501(a)(2). On September 9, 2022, Baby Erick had been in DCFS custody for over 120 days and in DCFS placement with DCFS resource parent Nsubuga—over Plaintiffs' family members—for nearly 90 days since discharge from the AVH NICU.

73.    Although the case plan "shall include a description of the type of home in which the child is to be placed, and the reasons for that placement decision… ." no such information was provided. Further, the "selection shall consider, in order of priority, placement with relatives, nonrelative extended family members, and tribal members; foster family homes, resource families,… ." Cal. Welf. & Inst. Code § 16501.1(d)(1). None of this information was provided.

_____

[3] Despite multiple requests for a copy and contrary to DCFS policy, Plaintiff SUMOYYAH LEE did not receive a copy of her CFT case plan until October 11, 2022—over a month after Defendant ACOSTA required her to sign an incomplete form and four days after Baby Erick died.

COMPLAINT
PAGE 18

74.     The Legislative intent underlying a case plan is to "ensure[] that the child receives protection and safe and proper care and case management, and that services are provided to the child and parents...in order to facilitate the safe return of the child to a safe home…and to address the needs of the child while in foster care." Cal. Welf. & Inst. Code § 16501.1(a)(2).

75.     The CFT process "shall engage…the child's family, and other people important to the family or to the child or youth… . The child and family team shall also include representatives who provide formal supports to the child and family, when appropriate, including…the caregiver." Cal. Welf. & Inst. Code § 16501(a)(4)(B)(i).

76.     The September 9, 2022 meeting with SUMOYYAH LEE at the hospital was the first and only time that a meeting was conducted on behalf of Baby Erick that involved his family. Contrary to the Code requirements, DCFS resource parent Nsubuga was not present during this meeting. Baby Erick was left in the care of DCFS resource parent Nsubuga's teenage niece, Maggie.

77.     On September 13, 2022, Plaintiff SUMOYYAH LEE inquired again with Defendant ACOSTA about the status of the new social worker and her sister Kiersten Irving's approval for monitoring her supervised visits. Defendant ACOSTA did not respond.

78.   On September 14, 2022, Plaintiff SUMOYYAH LEE inquired again about the status of her sister Kiersten Irving's approval as well as the name of the new MCMS Unit social worker, who had purportedly been assigned over a month ago back in August 2022. Defendant ACOSTA responded that she still did not know about the new social worker and that she was processing Kiersten Irving's approval.

79.   Frustrated with the utter lack of communication and disregard for her rights related to her infant baby, Plaintiff SUMOYYAH LEE texted Defendant ACOSTA on September 14, 2022, and stated that her rights were being violated and had been violated on numerous occasions since the day Baby Erick was taken from the hospital without notice to her.

80.   Further, Plaintiff SUMOYYAH LEE complained that Baby Erick was in and out of the hospital on multiple occasions for dehydration and DCFS was not doing anything to address these multiple hospitalizations, neglect, and lack of care, irrespective of the transfer to a new social worker in August 2022.

81.   She further asserted that despite these repeated incidents of dehydration, DCFS continued to release and place Baby Erick into the care of DCFS resource parent Nsubuga and her "family [who] are not capable of taking care of my child," "they are not taking precautions to prevent [Baby

Erick] from getting sick," "they hide things that are going on health wise" and "they feed him whatever they want."

82.     Finally, Plaintiff SUMOYYAH LEE closed her message to Defendant ACOSTA "Certificates don't make people responsible or compassionate I am not satisfied with my son's placement and I will start making noise until I am heard as of today…have a blessed day".

83.     Defendant ACOSTA did not respond to Plaintiff SUMOYYAH LEE.

84.     On September 19, 2022, Plaintiff SUMOYYAH LEE texted Defendant ACOSTA and again requested the status of approval for her family. Defendant ACOSTA did not respond.

85.     On September 22, 2022, DCFS resource parent Nsubuga informed Plaintiff SUMOYYAH LEE that her scheduled visit with Baby Erick the next day on September 23, 2022, could not move forward because she was told that Mr. Michael Irving "is not medically cleared to do visits!"

86.     At this point, as a result of DCFS' conduct, Plaintiff SUMOYYAH LEE had not seen her newborn baby in thirteen (13) days.

**C.      Defendants Failed to Protect Baby Erick.**

87.      DCFS resource parent Nsubuga met with hospital staff on June 27, 2022, to discuss discharge and Baby Erick's medical needs and care, such as feedings and olostomy care.

88.      The NICU discharge "plan," dated June 27, 2022, indicated "continue neocate feeds" as needed and "monitor weight, ostomy output."

89.      Further, the NICU discharge notes indicated that "Basic information about ileostomy" was discussed with DCFS resource parent Nsubuga, including demonstrations on emptying and changing the ostomy bag. The hospital's ostomy department notes recommended "home health for ostomy teaching reinforcement."

90.      The NICU discharge notes indicated that DCFS resource parent Nsubuga "declined home health help, given that she is a RN."

91.      Nevertheless, Plaintiff SUMOYYAH LEE retained medical decision-making authority with respect to Baby Erick. Notwithstanding this requirement, DCFS routinely failed to provide notice and obtain consent from Plaintiff SUMOYYAH LEE regarding Baby Erick's medical treatment, emergencies, and interventions.

92.     Shortly after DCFS' placement of Baby Erick with DCFS resource parent Nsubuga, Plaintiff SUMOYYAH LEE requested to attend an eye doctor's appointment for Baby Erick. Defendant ACOSTA declined Plaintiff SUMOYYAH LEE's request and indicated that DCFS resource parent Nsubuga would need to approve the request.

93.     On July 12, 2022, Plaintiff SUMOYYAH LEE accompanied Nsubuga and Baby Erick to a pediatrician visit. During this visit, the pediatrician directed DCFS resource parent Nsubuga to rotate Baby Erick's head more to prevent his developing flat head syndrome.

94.     Defendants ratified and consented to Baby Erick's placement in the custody and care of DCFS resource parent Nsubuga's family members and affiliates. These individuals and incidents include, but are not limited to, the following:

    a.  Baby Erick was left alone in the custody and care of DCFS resource parent Nsubuga's "husband," (name unknown) also referenced as "foster dad" when he dropped Baby Erick off on a supervised visit with Plaintiff SUMOYYAH LEE on July 16, 2022, and took Baby Erick to a pediatrician appointment on or about July 27, 2022.

    b.  Baby Erick was left alone in the custody and care of DCFS resource parent Nsubuga's niece, Maggie (LNU), at the emergency room on September 9, 2022. Upon information and belief, Maggie is a teenager.

    c.  Baby Erick was left alone in the custody and care of DCFS resource parent Nsubuga's sister on October 7, 2022—the same day that Baby Erick died.[4]

95.    Upon information and belief, Defendants either knew or should have known that Baby Erick was being cared for by DCFS resource parent Nsubuga's affiliates, rather than Nsubuga herself. For example, in responding to Plaintiff SUMOYYAH LEE's repeated complaints that she was unable to get her certified family members approved to monitor her supervised visits with Baby Erick and that Baby Erick was frequently left with DCFS resource parent Nsubuga's unqualified affiliates, Defendant ACOSTA stated on multiple occasions that DCFS resource parent Nsubuga was able to leave Baby Erick with "trusted" affiliates.

96.    Though Defendants purportedly placed Baby Erick with DCFS resource parent Nsubuga in part because of her RN qualifications, they nonetheless

---

[4] DCFS resource parent Nsubuga also told Plaintiff SUMOYYAH LEE that her sister moved in with her to help her with her foster children because it was too much for her to handle alone.

COMPLAINT
PAGE 24

permitted unqualified, underaged people affiliated with Nsubuga to care for Baby

Erick, and in lieu of his own, F-rate certified, qualified, willing family members.

97.    Upon information and belief, Defendants failed to conduct the

required criminal background checks for all residents and affiliates related to the

DCFS resource parent, including DCFS resource parent Nsubuga's husband, niece,

and sister.

98.    Upon information and belief, Defendants failed to ensure that the

DCFS resource parent's home was safe, including proper bedding and sleeping

quarters.

99.    Upon information and belief, Defendants failed to ensure that the

DCFS resource parent and her affiliates were qualified to provide the specialized

medical care for Baby Erick, including, but not limited to monitoring and

recording feeding input and output, providing ileostomy care, CPR certification,

and other medical needs of Baby Erick.

100.   Upon information and belief, Defendants failed to conduct the

requisite number of visits to the home of its resource parent. Defendant ACOSTA

made two visits to the DCFS resource parent's home over the course of Baby

Erick's 101-day placement in DCFS resource parent Nsubuga's home.

101.   Defendants routinely failed to provide notice and obtain consent from Plaintiff SUMOYYAH LEE regarding Baby Erick's medical treatment, emergencies, and interventions notwithstanding the fact that Plaintiff SUMOYYAH LEE retained medical decision-making authority and was available to provide such consent. In fact, Defendants regularly failed to provide Plaintiff SUMOYYAH LEE timely, full, and complete information regarding the severity of Baby Erick's condition requiring an emergency room and/or hospitalization.

102.   DCFS consented to and ratified the return of Baby Erick to the custody and care of DCFS resource parent Nsubuga after each of three emergency room/urgent care visits and/or hospital admissions for severe dehydration—occurring on July 31, 2022, September 9, 2022, and September 23, 2022.

103.   DCFS placed and continued to place Baby Erick with DCFS resource parent Nsubuga, even though Baby Erick became severely dehydrated each time he was left in the care of DCFS resource parent Nsubuga after each hospitalization because DCFS resource parent Nsubuga and her affiliates were not feeding him properly.

**D.   July 31, 2022 Emergency Room and Hospitalization**

104.   On July 31, 2022, Baby Erick was admitted to the emergency room for severe dehydration.

105.   Upon admission to the emergency room, he weighed 7.58 pounds.

106.    Between July 27, 2022, when he was 8.5 pounds, and the date of his emergency room admission four days later on July 31, 2022, he had dropped nearly a pound, or nearly 12% of his body weight.

107.   Baby Erick was transferred from the emergency room to inpatient at Children's Hospital in Los Angeles ("CHLA").

108.   Upon his admission to the hospital, it was noted that Baby Erick was "covered in a significant amount of ileostomy output from leakage in his bag."

109.    The hospital notes indicated that DCFS resource parent Nsubuga reported that she noticed Baby Erick's ileostomy output had changed from a baseline green color to beige, milky-appearing fluid but she was "unsure of the exact amount" and had not maintained any such records (notwithstanding the doctors' discharge instructions requiring her to do so and her purported nursing experience and skills).

110.   During his hospital stay, medical providers determined that Baby Erick developed hypernatremia, metabolic acidosis, and AKI or acute renal failure, related to his "severe dehydration."

111.   Dr. Burnim at CHLA noted that "Erick is critically ill, and in need of careful electrolyte correction and fluid replenishment."

112.   Although Plaintiff SUMOYYAH LEE retained all parental rights, including medical consent, DCFS did not inform her that Baby Erick was or might be admitted into the emergency room until after he was admitted.

113.   In fact, on August 2 and August 3, DCFS resource parent Nsubuga falsely led Plaintiff SUMOYYAH LEE to believe that Baby Erick's condition was not critical by telling her that Baby Erick was doing "very fine" and that he was likely going to be discharged the following day or two. In fact, Baby Erick's condition was critical as a result of dehydration, as evidenced by his nearly 20-day hospitalization.

114.   After 6 days in the hospital with replenished fluids, the following is photograph of Baby Erick in the hospital.



115.    After 20 days in the hospital, Baby Erick was discharged on August 19, 2022. He weighed 9.37 pounds on discharge and had gained approximately two pounds in the hospital.

**E.    Inadequate Post-Discharge Care: August 19-September 9, 2022.**

116.    Less than three weeks later, on September 8, 2022, Baby Erick was taken to his pediatrician by DCFS resource parent Nsubuga.

117.    Baby Erick's weight had dropped again to 9.3125 pounds. He weighed less than his discharge weight three weeks earlier.

118.    Concerned with his weight, the pediatrician ordered laboratory tests on Baby Erick and the results came back later that day at critical levels, indicating severe dehydration.

119.    With the return of the critical laboratory results, the pediatrician called DCFS resource parent Nsubuga twice and left two voicemails on September 8, 2022, to instruct DCFS resource parent Nsubuga to take Baby Erick to the emergency room. DCFS resource parent Nsubuga did not return the pediatrician's call until the next day.

120.    On September 9, 2022, the pediatrician again instructed DCFS resource parent Nsubuga to take Baby Erick to the emergency room, given his critical laboratory results.

121.    Despite retaining all medical consent rights, Plaintiff SUMOYYAH LEE was not informed about Baby Erick's critical condition, visit to the emergency room, or admission until after he was admitted to the hospital on September 9, 2022.

**F.    September 9, 2022, Emergency Room and Hospitalization**

122.    The emergency room notes indicated that Baby Erick was in severe dehydration and in renal failure. Baby Erick needed to be airlifted to UCLA Ronald Reagan Hospital.

123.    Baby Erick's admission weight was 9.42 pounds.

124.    Baby Erick had barely gained any weight since his discharge from the hospital and DCFS replacement in DCFS resource parent Nsubuga's care over the course of three weeks.

125.    During his hospitalization, the nutrition assessment notes indicated that Baby Erick became dehydrated due to lack of sufficient volume feeding. In other words, DCFS resource parent Nsubuga and her unqualified associates were not feeding Baby Erick enough.  The nutritionist "encouraged [Nsubuga] to work on increasing volume of feeds."

126.    After three days in the hospital, Baby Erick was discharged on September 12, 2022.

127.   Upon discharge, Baby Erick weighed 10.23 pounds—a weight gain of nearly a pound over the course of three days.

**G.   Inadequate Post-Discharge Care: September 12-23, 2022.**

128.   Baby Erick was seen by his pediatrician on September 15, 2022, three days after his discharge from the hospital and again he had lost weight: he weighed 10.18 pounds.

129.   On September 15, 2022, the pediatrician noted that DCFS resource parent Nsubuga complained that *she* was not getting enough sleep.

130.   Further, the pediatrician's notes indicated that although Baby Erick was taking 60cc of formula every 3 hours (8 times a day) at the hospital, now that he was home, DCFS resource parent Nsubuga complained that she was having difficulty feeding Erick.

131.   The pediatrician also noted "Absolute weight gain is inadequate."

132.   Noting the inadequate weight gain and DCFS resource parent Nsubuga's complaints about not sleeping, the pediatrician noted "He must have a G-tube!! Or at least a NG temporarily" and that "He will need an NG tube for continuous overnight feeds."

133.   On September 17, 2022, Plaintiff SUMOYYAH LEE visited with Baby Erick and noticed an old bloody band aid on his arm. She lifted the band aid

and there was a strong foul odor where the band aid had been. Plaintiff SUMOYYAH LEE took a picture of the band aid.

134.   Given the odor and condition of the band aid, Plaintiff SUMOYYAH LEE surmised that it had been left on Baby Erick since his discharge from the hospital five days earlier and Baby Erick was not sufficiently bathed to ensure safety and cleanliness of the wound.

135.   Plaintiff SUMOYYAH LEE called the DCFS hotline and contacted Defendant ACOSTA again to complain about DCFS resource parent Nsubuga's neglect of Baby Erick and to report the incident.

136.   On September 20, 2022, Plaintiff SUMOYYAH LEE sent pictures of the old bloody band aid from Baby Erick's arm to Defendant ACOSTA.



137.   Defendant ACOSTA never responded to Plaintiff SUMOYYAH LEE's questions or inquiries about the band aid.

138.   Upon information and belief, Defendant County never conducted an investigation regarding Plaintiff SUMOYYAH LEE's complaint to Defendant ACOSTA or the DCFS hotline.

**H.       September 23, 2022 Urgent Care**

139.   On September 23, 2022, DCFS resource parent Nsubuga again took Baby Erick to urgent care.

140.   The urgent care visit notes indicated that Baby Erick was dehydrated.

141.   The notes also indicated that DCFS resource parent Nsubuga complained that she had "difficulty" feeding Baby Erick.

142.   Urgent care directed DCFS resource parent Nsubuga to go to the emergency room for evaluation.

143.   UCLA evaluated Baby Erick but did not admit him and he was released back into the care of DCFS resource parent Nsubuga.

**I.     Baby Erick's Final Days and Inadequate Post-Discharge Care: September 23-October 7, 2022.**

144.   Later that afternoon, Plaintiff SUMOYYAH LEE requested to see Baby Erick and drove to a park to see him. Plaintiff SUMOYYAH LEE held and fed Baby Erick a full bottle, without incident.

145.   Plaintiff SUMOYYAH LEE never had a problem feeding Baby Erick and never experienced the same complaints about feeding Baby Erick that DCFS resource parent Nsubuga made.

146.   That was the last time Plaintiff SUMOYYAH LEE was able to hold her baby.

147.   On September 28, 2022, Plaintiff SUMOYYAH LEE continued to inquire about Baby Erick's condition and feeding regimen with DCFS resource parent Nsubuga. DCFS resource parent Nsubuga complained that she was unable

to sleep and that it was a 24-hour job taking care of Baby Erick. Plaintiff

SUMOYYAH LEE responded that that was her job.

148.    On September 27, 2022, Plaintiff SUMOYYAH LEE texted DCFS

resource parent Nsubuga and asked to attend Baby Erick's pediatrician

appointment the next day so that she could "know what's going on with him."

149.    DCFS resource parent Nsubuga lied to Plaintiff SUMOYYAH LEE

and told her that Baby Erick would not be seen by the pediatrician and that he was

only going in for laboratory work. However, Baby Erick was scheduled to be and

was seen and assessed by his pediatrician, Dr. Feldman, on September 28, 2022.

Baby Erick weighed 10.56 pounds. He had gained only a little over 40 ounces in

nearly a week (in contrast to his several pound weight gain while in the hospital

for 3 days).

150.    On September 29, 2022, Plaintiff SUMOYYAH LEE and DCFS

resource parent Nsubuga arranged for Plaintiff SUMOYYAH LEE to see Baby

Erick the next day, September 30, 2022 at 3:00 p.m.

151.    At 9:21 a.m. on September 30, 2022, DCFS resource parent Nsubuga

texted Plaintiff SUMOYYAH LEE to change the time and told Plaintiff

SUMOYYAH LEE to come at 11:00 am instead—approximately an hour later.

152.   Given the short notice and her work schedule, Plaintiff SUMOYYAH LEE could not come at that time. Instead, she requested to see Baby Erick the next day on October 1, 2022, but DCFS resource parent Nsubuga declined her request. Plaintiff SUMOYYAH LEE complained to DCFS resource parent Nsubuga that she was preventing her from seeing her baby and that "something is always happening" every time that she tried to schedule a visit with her baby.

153.   Plaintiff SUMOYYAH LEE was unable to visit her son on October 1, 2022.

154.   Given the critical nature of Baby Erick's multiple visits to the emergency room and hospitalizations due to dehydration and the importance of frequent and consistent feedings, on October 5, 2022, Plaintiff SUMOYYAH LEE inquired via text to DCFS resource parent Nsubuga about Baby Erick and his eating.

155.   DCFS resource parent Nsubuga responded the next day by complaining about Baby Erick's feeding regimen.

156.   On October 6, 2022, Plaintiff SUMOYYAH LEE also requested to see her son the next day, October 7, 2022, after 3:00 p.m. when she would be done with work. DCFS resource parent Nsubuga responded that she was not available to monitor the visit at 3:00 p.m. and that Plaintiff SUMOYYAH LEE would have to

come at noon. Given Plaintiff SUMOYYAH LEE's conflicting work schedule, she could not visit Baby Erick on October 7, 2022.

157.   On October 7, 2022, around 9:48 a.m., Plaintiff SUMOYYAH LEE sent DCFS resource parent Nsubuga a text to request a visit with Baby Erick on October 9, 2022. DCFS resource parent Nsubuga responded "ok."

158.   A few hours later, at approximately 2:07 p.m., DCFS resource parent Nsubuga's sister, who was alone with Baby Erick in DCFS resource parent Nsubuga's home, called 911 to report that Baby Erick was not breathing. EMS responded and Baby Erick was pronounced dead on the scene at 2:53 pm.

159.   On October 8, 2022, at 2:38 pm—24 hours after her baby had died, unbeknownst to her—Plaintiff SUMOYYAH LEE requested from DCFS resource parent Nsubuga confirmation of the time for her visit with Baby Erick the following day on October 9, 2022.

160.   Shortly thereafter, instead of receiving a response or call from Defendant ACOSTA or DCFS resource parent Nsubuga, Plaintiff SUMOYYAH LEE received a call from Baby Erick's pediatrician, who informed her that Baby Erick had died the day before. Notably, Baby Erick's body was transported directly to the coroner's office and the pediatrician was not present or involved in the care of Baby Eric on the day of his death. Thus, DCFS resource parent

Nsubuga, Defendant ACOSTA, Defendant GOWDY, and/or another DCFS representative took time to call and inform Baby Erick's pediatrician of his death, but did not bother to contact Plaintiffs—Baby Erick's parents.

161.   After she hung up with the pediatrician, Plaintiff SUMOYYAH LEE immediately called DCFS resource parent Nsubuga and DCFS resource parent Nsubuga lied Plaintiff and told her that she was home at the time of Baby Erick's death. However, DCFS resource parent Nsubuga was not at home and had left Baby Erick with her sister, who was not F-rate certified or a medical professional. Although she was not home, DCFS resource parent Nsubuga also claimed that Baby Erick had choked to death.

162.   After the call, DCFS resource parent Nsubuga sent Plaintiff SUMOYYAH LEE the business cards for the Los Angeles Sheriff's Department Homicide Investigator and the County Coroner's office.

163.   On October 9, 2022, Plaintiff SUMOYYAH LEE also texted Defendant ACOSTA, enraged that she had repeatedly warned DCFS about Baby Erick's care in DCFS' placement with DCFS resource parent Nsubuga, and that not only was nothing was done, but DCFS repeatedly re-entrusted Baby Erick into Nsubuga's care.  Defendant ACOSTA did not respond.

164.   Contrary to DCFS policy, as of October 11, 2022, Plaintiff SUMOYYAH LEE still had not received a copy of the CFT notes or documents from Defendant ACOSTA or DCFS.

165.   Plaintiff SUMOYYAH LEE texted Defendant ACOSTA again and requested the CFT notes. Finally, Defendant ACOSTA sent the CFT notes on Baby Erick to Plaintiff SUMOYYAH LEE—four days after Baby Erick had died.

166.   On October 25, 2022, Plaintiff SUMOYYAH LEE requested to meet with DCFS resource parent Nsubuga to collect Baby Erick's belongings, and DCFS resource parent Nsubuga again erroneously claimed that Baby Erick had choked to death.

**J. Medical Examiner's Report**

167.   The Los Angeles County Department of Medical Examiner ("ME") conducted an autopsy of Baby Erick on October 10, 2022. It was produced to Plaintiffs on or about June 22, 2023.

168.   Although the Medical Examiner's Office, an agency of the County of Los Angeles, failed to determine a cause of death, the Report indicated the following relevant facts:

   a.   Baby Erick was with his "foster aunt" while his "foster mother was away."

b. The foster aunt had just fed Baby Erick and "placed him down for a nap on a makeshift pallet, made from multiple blankets, that was placed at the foot of her recliner."

c. An "unsafe sleep environment" contributed to the cause of death.

d. After the foster aunt placed Baby Erick on the floor, the foster aunt "was on her phone for approximately 10 minutes when she looked up and noticed [Baby Erick] was not breathing."

e. The foster aunt "attempted" CPR on Baby Erick and reported that "vomit emitted from [Baby Erick's] mouth."

f. Upon arrival of EMS personnel, EMS continued "life-saving measures however despite their efforts," Baby Erick was pronounced dead on the scene at 2:53 pm.[5]

169. Further, the ME report and toxicology records noted the following high ranges, among other things:

a. BUN, CL, and K were flagged as High.

b. BUN level was over 140 mg/dL and the reference range is 8-26.

c. Cl level was over 140 md/dL and the reference range is 98-109.

_____

[5] The ME report erroneously references October 6, 2022, instead of October 7, 2022.

COMPLAINT
PAGE 40

    d.   K level was over 9 mmol/L and the reference range is 3.5-4.9.

    e.   Glu level was less than 20 mg/dL and the reference range is 70-105.

    f.   Crea level was 3.0 mg/dL and the reference range is .600-1.299.

170.   Based on the ME report, Baby Erick's levels were, once again, at critical levels and he was severely dehydrated, if not in renal failure, as a result of insufficient fluid administration (i.e., inadequate feeding).

171.   In other words, Baby Erick starved to death.

172.   Baby Erick's ME laboratory results also show the presence of doxylamine in his blood/heart, 1.1 ug/mL in his EDTA Heart Blood, 2.7 ug/g in his liver.

173.   Doxylamine is an adult sleeping aid, typically found in adult sleeping aid products such as Unisom, NyQuil and prohibited in use of children under the age of 12, let alone a premature infant.

**K. DCFS Failed to Follow Policies and Procedures and Statutory Requirements**

174.   Defendant County of Los Angeles and DCFS have refused to produce any documents in response to Plaintiffs' Public Records Act request and directed Plaintiffs to request the DCFS records from the juvenile court. Such a request has been made and is pending.

175.   As outlined above,  Defendant ACOSTA conducted a Child and Family Team ("CFT") meeting on September 9, 2022.  The CFT meeting was conducted in violation of a number of DCFS policies and procedures: the case plan was dated September 9, 2022—over 120 days since Baby Erick's formal placement in Defendant DCFS custody and over 60 days since he was physically taken into DCFS custody; DCFS did not engage all of the necessary parties, including DCFS resource parent Nsubuga and Plaintiffs' certified family members; and Plaintiff was required to sign an incomplete form. Moreover, this CFT meeting was conducted *after* Baby Erick had already been transferred to the MCMS unit—also without the requisite reviews and documents.

176.   Despite multiple requests, Plaintiff SUMOYYAH LEE did not receive a copy of the CFT until October 11, 2022, four days *after* Baby Erick died.

177.   Contrary to DCFS case transfer policies, for over a month, beginning in mid-August 2022 until September 23, 2022, Defendants never provided Plaintiff SUMOYYAH LEE with contact information for the new social worker from the MCMS unit despite repeated requests for such contact information.

178.   On September 23, 2022, Defendant ACOSTA provided Plaintiff SUMOYYAH LEE with the name of the new social worker, Defendant GOWDY,

but claimed that "it was switched today" but she still did not have his contact information.

179.    Contrary to DCFS policies and procedures, at a minimum, Defendants moved Baby Erick's case to the DCFS MCMS unit in late September – nearly 150 days after DCFS obtained custody of Baby Erick and nearly 90 days after he was discharged from the UCLA NICU into the physical custody of DCFS resource parent Nsubuga (purportedly *because* of his nonexistent medically fragile status) and two weeks before he died.

180.    Though required by department policies and procedures, DCFS never completed an Individualized Health Care Plan ("IHCP") for Baby Erick at any time, let alone prior to placement in DCFS resource parent Nsubuga's home.

181.    Defendant GOWDY never met DCFS resource parent Nsubuga or Baby Erick and never visited DCFS resource parent Nsubuga's home.

182.    During a telephone conversation between with Plaintiff SUMOYYAH LEE and Defendant GOWDY, Defendant GOWDY stated that he was working on transferring Baby Erick to Plaintiffs' family members and that he did not know why Baby Erick had not been placed with her family members.

183.    Defendants knew or should have known about Baby Erick's multiple emergency room visits and hospitalizations for "severe dehydration," resulting

from inadequate feeding, for an infant in DCFS custody. However, no action was taken to address or monitor Baby Erick's placement and/or his repeated hospitalizations.

184. In fact, DCFS prevented other capable, qualified, loving, and willing family members from taking over as Baby Erick's resource parents.

185. Defendants violated federal and state laws, as well as DCFS policies, procedures, and customs.

186. CDSS and DCFS, by and through their officials, employees and agents

    a.  violated Cal. Welf. & Inst. Code §309(a) by failing to establish that there was a specific and articulable basis for immediate and urgent necessity to remove Baby Erick from Plaintiffs;

    b.  violated Cal. Welf. & Inst. Code § 309(d)(1) by failing to initiate an assessment of Baby Erick and Plaintiffs' relatives' suitability for emergency placement pursuant to § 361.4;

    c.  violated Cal. Welf. & Inst. Code §361.2 by failing to determine or consider whether Baby Erick could be placed with either Plaintiff parent;

d.  violated Cal. Welf. & Inst. Code § 361.3 and 42 U.S.C. §671 (a)(19)(a)(19) by failing to conduct family finding and/or give preferential consideration to a relative of Baby Erick;

e.  violated Cal. Welf. & Inst. Code §361.5 by failing to provide child welfare services, including family reunification services, to Baby Erick and his Plaintiff parents;

f.  violated Cal. Code Regs. Tit. 22 §89387(a)(7) by failing to ensure that Baby Erick was provided a safe sleeping environment with an individual bed equipped with a clean, comfortable mattress, clean linens, blankets, and pillows, as needed, all in good repair;

g.  violated Cal. Welf. & Inst. Code § 16519.5(a) and § 17739(b) by failing to implement a "unified, family friendly, and child-centered resource family approval process" to approve relatives and nonrelative extended family members as foster care providers;

h.  violated Cal. Welf. & Inst. Code §16519.5(d)(1)(A)(i) by failing to conduct an adequate and comprehensive family home environment assessment of DCFS resource parent Nsubuga and her affiliates, including, but not limited to her "husband," "niece," and "sister" for

COMPLAINT
PAGE 45

purposes of criminal records clearance of all adults residing in, or regularly present in, the home;

i.   violated Cal. Welf. & Inst. Code §§ 16519.5(d)(1)(C) 17710(a) by failing to conduct a family home environment assessment regarding specialized in-home health care that established DCFS resource parent Nsubuga and her affiliates had a demonstrated understanding about the rights of children in their care and their responsibility to safeguard those rights; that the total number of children residing in DCFS resource parent Nsubuga's home was no more than the total number of children DCFS resource parent Nsubuga could properly care for; and that DCFS resource parent Nsubuga understood her responsibilities with respect to acting as a reasonable and prudent parent, and maintaining the least restrictive environment that serves the needs of the child;

j.   violated Cal. Welf. & Inst. Code § 17731 by failing to develop and implement a plan to place children with special health care needs in foster care and ensuring that the health care plan documented that DCFS resource parent Nsubuga had the necessary

qualifications and expertise to meet the child's in-home health care needs; and

k.   violated Adoption Assistance and Child Welfare Act of 1980, as amended by the Adoption and Safe Families Act of 1997, 42 U.S.C. § 671 et seq., and the regulations promulgated under the Act, 45 C.F.R. Parts 1355-1357, including but not limited to: sufficient and established standards related to the admissions policies, safety, sanitation, and protection of civil rights and which shall permit use of the reasonable and prudent parenting standard; determining reasonable efforts with respect to the child's health and safety as the paramount concern; making reasonable efforts to preserve and reunify families and prior to placement of a child in foster care, to prevent or eliminate the need for removing the child from the child's home; development of a timely and complete case plan; conducting visitation of the child at least three times in the first 30 calendar days and once each month; giving preference to an adult relative over a non-related caregiver when determining a placement for a child; providing procedures for and implementation of criminal records checks, registries, and databases for all foster parents and their

affiliates, including any other adult living in the home of the foster parent; ensuring that prospective foster parents will be prepared adequately with the appropriate knowledge and skills to provide for the special needs of the child and that the preparation will be continued, as necessary, after the placement of the child, and that the preparation shall include knowledge and skills relating to the reasonable and prudent parent standard for the participation of the child in age; and provide timely and adequate notice within 30 days after removal of a child from the custody of the parent to identify and provide notice to relatives of the child, pursuant to 42 U.S.C. §§ 671(a)(10), 671(a)(15), 671(a)(19), 671(a)(20), 671(a)(24), and 675(1).

187.  Further, the CDSS, by and through its officials, employees and agents

a.  violated Cal. Welf. & Inst. Code §16519.5(f) by failing to monitor and investigate CDFS's implementation of and compliance with its resource family approval requirements and obligations; and

b.  violated Cal. Welf. & Inst. Code §16519.5(h) by failing to ensure that DCFS resource parent Nsubuga had the specialized training and

would ensure implementation of any such specialized training to meet the needs of Baby Erick.

188. Upon information and belief, DCFS resource parent Nsubuga and her affiliates failed to provide any specialized medical care, let alone best practices for providing care and supervision to Baby Erick's special health care needs.

189. These actions and omissions are contrary to the DCFS and California Department of Social Services ("CDSS") Continuum of Care Reform Act, which includes:

> Statewide implementation of the Resource Family Approval process will improve selection, training and support of families under a streamlined, family friendly process for approving families (including relatives) seeking to care for a child in foster care, whether on an emergency, temporary or permanent basis. All families will receive training.[6]

---

[6]https://www.cdss.ca.gov/resource-families/continuum-of-care-reform#:~:text=The%20Fundamental%20Principles%20Of%20CCR,assessment%2C%20placement%20and%20service%20planning (last visited August 18, 2023).

# VI.   CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF
## VIOLATION OF CIVIL RIGHTS (42 U.S.C. § 1983)
### Fourteenth Amendment
### (Substantive Due Process: Duty to Protect)
### Against All Defendants

190.    Plaintiffs incorporate all paragraphs, as though fully set forth herein.

191.    At all times, each of the Defendants was acting under color of state law in the performance of his or her official duties.

192.    Each of these Defendant's acts and omissions deprived each Plaintiff of her or his particular rights under the Constitution and laws of the United States.

193.    Defendants' conduct as alleged herein deprived Plaintiffs of their clearly established and well-settled rights under the Fourteenth Amendment to the United States Constitution, including their right to be free from harm, to be in a safe foster care placement, and their right to medical care, treatment, and services.

194.    By removing Baby Erick from his biological parents, Defendants created a special relationship with Baby Erick and as a result had certain obligations related to his safety, protection, custody and care.

195.    Defendants had a duty to protect Baby Erick's liberty interests, including, but not limited to adequate supervision and protection from harm while in DCFS custody and DCFS placement.

196.   Defendants served as the *de facto* parent of Baby Erick and had a duty to keep Baby Erick in a safe environment and to ensure the continuing safety of that environment.

197.   Defendants owed Baby Erick reasonable safety and minimally adequate care. Defendants' conduct includes, among others, the following acts and omissions:

    a.   Failure to adequately provide adequate medical services for medically fragile infant;

    b.   Failure to ensure first priority placement with qualified family or kin caregivers;

    c.   Failure to monitor infants in their custody and conduct legally required visits with foster children;

    d.   Failure to adequately respond to reports of abuse and neglect;

    e.   Failure to ensure adequacy of resource parent placements;

    f.   Failure to ensure adequacy of other adults in resource parent's residence;

    g.   Failure to preserve and reunify families;

    h.   Failure to adequately approval, qualify, and authorize resource families for children with special needs and/or designated as

medically fragile; and

i.  Failure to adequately inspect and monitor treatment and services provided to foster children by resource families for children with special needs and/or designated as medically fragile.

198.   Defendants' acts and omissions alleged herein constitute a policy, pattern, practice, custom, final policymaking act, and/or ratification of a subordinate or agent's action that deprived Plaintiffs of their constitutional rights.

199.   Defendants' acts and omissions alleged herein reflect a lack of professional judgment, and constituted intentional and/or deliberate indifference to Plaintiffs' constitutional rights.

200.   The complained of acts of Defendants were shocking to the conscience, beyond the bounds of acts tolerable in a civilized society, and so egregious and outrageous that they may fairly be said to shock the contemporary conscience.

201.   Defendants' acts and omissions complained of herein have caused the violation of Plaintiffs' Constitutional rights and caused Plaintiffs to suffer damages, including significant physical and emotional harm, in an amount to be determined at trial. These damages are compensable pursuant to 42 U.S.C. § 1983.

202.   As described herein, Defendants' acts or omissions were in willful, malicious, wanton, reckless or callous disregard of and/or deliberate indifference to Plaintiffs' rights, thereby entitling Plaintiffs to punitive and exemplary damages.

## SECOND CLAIM FOR RELIEF
### VIOLATION OF CIVIL RIGHTS (42 U.S.C. § 1983)
### Fourteenth Amendment
### (Substantive Due Process: State Created Danger)
### Against All Defendants

203.   Plaintiffs incorporate all paragraphs, as though fully set forth herein.

204.   Defendants' acts and omissions as alleged herein deprived Plaintiffs of their clearly established and well-settled rights to personal liberty under the Fourteenth Amendment to the United States Constitution. Defendants' conduct includes, among other things, acting with deliberate indifference to known or obvious danger in:

a.  Removing Baby Erick from Plaintiffs' custody and care and placing and re-placing him in an unsafe home and environment;

b.  Placing Baby Erick with unqualified and unmonitored DCFS resource parent and/or unqualified and unmonitored affiliates of a DCFS resource parent;

c.  Placing Baby Erick in an environment that resulted in three emergency room visits and/or hospitalizations;

d. Placing Baby Erick in an environment where he "failed to thrive" and failing to take any action to investigate and/or address Baby Erick's feeding needs;

e. Placing Baby Erick in an environment where he required multiple emergency room visits and hospitalizations for severe dehydration and/or renal failure due to insufficient feeding;

f. Returning Baby Erick back into the same environment where he suffered from severe dehydration, requiring multiple emergency room visits and hospitalizations;

g. Placing Baby Erick in a home with various caretakers who were not qualified to care for him;

h. Ignoring multiple pleas and complaints from Plaintiff SUMOYYAH LEE regarding Baby Erick's deficient care;

i. Repeatedly refusing to place Baby Erick with capable, qualified, loving, and willing family members;

j. Repeatedly refusing to consider returning Baby Erick to his mother, Plaintiff SUMOYYAH LEE; and

k. Repeatedly re-placing Baby Erick with and re-entrusting him to DCFS resource parent Nsubuga after (a) each hospitalization

resulting from her failure to properly feed and care for him; and

(b) each home visit at which DCFS resource parent Nsubuga's

and her affiliates' inability to properly care for Baby Erick was

and should have been apparent.

205.    Defendants' pattern of actions and omissions created dangers for Baby Erick that he would not have faced had the Defendants adequately protected him.

206.    At all times, each of the Defendants was acting under color of state law in the performance of his or her official duties.

207.    Defendants' acts and omissions alleged herein constitute a policy, pattern, practice, custom, final policymaking act, and/or ratification of a subordinate or agent's action that deprived Plaintiffs of their constitutional rights.

208.    The complained of acts of Defendants were shocking to the conscience, beyond the bounds of acts tolerable in a civilized society, and so egregious and outrageous that they may fairly be said to shock the contemporary conscience.  Plaintiffs' injuries were a foreseeable result of Defendants' acts.

209.    Defendants' acts and omissions complained of herein have caused the violation of Plaintiffs' Constitutional rights and caused Plaintiffs to suffer

damages, including significant physical and emotional harm, in an amount to be determined at trial. These damages are compensable pursuant to 42 U.S.C. § 1983.

210.   As described herein, Defendants' acts or omissions were in willful, malicious, wanton, reckless or callous disregard of and/or deliberate indifference to Plaintiffs' rights, thereby entitling Plaintiffs to punitive and exemplary damages.

## THIRD CLAIM FOR RELIEF
### VIOLATION OF CIVIL RIGHTS (42 U.S.C. § 1983)
### Fourteenth Amendment
### (Procedural Due Process: Interference with Familial Relationship)
### Against All Defendants

211.   Plaintiffs incorporate all paragraphs, as though fully set forth herein.

212.   The Fourteenth Amendment guarantees that parents will not be separated from their children without due process of law.

213.   Defendants unlawfully maintained, continued, and extended constitutional interference with Plaintiffs and Baby Erick's liberty interests and right to familial association.

214.   Defendants interfered, prevented, and obstructed Plaintiff SUMOYYAH LEE's ability, as a mother, and Plaintiff ERICK J. LEE, as a father, to bond and care for their premature newborn infant with deliberate and reckless disregard for their rights as a mother and father, and Baby Erick's rights as a child.

215.   At all times, each of the Defendants was acting under color of state law in the performance of his or her official duties.

216.   Defendants' acts and omissions alleged herein constitute a policy, pattern, practice, custom, final policymaking act, and/or ratification of a subordinate or agent's action that deprived Plaintiffs of their constitutional rights.

217.   The complained of acts of Defendants were shocking to the conscience, beyond the bounds of acts tolerable in a civilized society, and so egregious and outrageous that they may fairly be said to shock the contemporary conscience.

218.   Defendants' acts and omissions complained of herein have caused the violation of Plaintiffs' Constitutional rights and caused Plaintiffs to suffer damages, including significant physical and emotional harm, in an amount to be determined at trial. These damages are compensable pursuant to 42 U.S.C. § 1983.

219.   As described herein, Defendants' acts or omissions were in willful, malicious, wanton, reckless or callous disregard of and/or deliberate indifference to Plaintiffs' rights, thereby entitling Plaintiffs to punitive and exemplary damages.

## FOURTH CLAIM FOR RELIEF
### VIOLATION OF CIVIL RIGHTS (42 U.S.C. § 1983)
### First Amendment
### (Familial Association)
### Against All Defendants

220.    Plaintiffs incorporate all paragraphs, as though fully set forth herein.

221.    At all times, each of the Defendants was acting under color of state law in the performance of his or her official duties.

222.    Each of these Defendants' acts and omissions deprived each Plaintiff of his particular rights under the Constitution and laws of the United States.

223.    Each Plaintiff has and had First Amendment familial association rights, which includes the right of parents and children to not have interference by the state regarding the parent-child relationship and association.

224.    Plaintiffs' parental rights had not been terminated. Defendants' actions interfered with Plaintiffs familial association right to parent Baby Erick, without government interference.

225.    Defendants' actions or omissions caused interference with the constitutionally protected familial relationship and was for purposes of oppression and interference of the familial relationship.

226.    Defendants had no legitimate interest in interfering with the Plaintiffs' parent-child relationship.

227.   Defendants' actions or omissions violated Plaintiffs' familial association rights in their mutual companionship and nurturing interests.

228.   Defendants' actions were intentional and with deliberate deprivation and/or indifference to the familial association interests of Plaintiffs.

229.   The complained of acts of Defendants were shocking to the conscience, beyond the bounds of acts tolerable in a civilized society, and so egregious and outrageous that they may fairly be said to shock the contemporary conscience.

230.   Defendants' acts and omissions complained of herein have caused the violation of Plaintiffs' Constitutional rights and caused Plaintiffs to suffer damages, including significant physical and emotional harm, in an amount to be determined at trial. These damages are compensable pursuant to 42 U.S.C. § 1983.

231.   Plaintiffs are entitled to injunctive relief against Defendants' conduct as described herein because Plaintiffs may suffer and continue to suffer substantial and immediate irreparable injury from such conduct unless and until Defendants are restrained.

232.   As described herein, Defendants' acts or omissions were in willful, malicious, wanton, reckless or callous disregard of and/or deliberate indifference to Plaintiffs' rights, thereby entitling Plaintiffs to punitive and exemplary damages.

## FIFTH CLAIM FOR RELIEF
### VIOLATION OF CIVIL RIGHTS (42 U.S.C. § 1983)
### Federal Adoption Assistance Act and Child Welfare Act
### Against All Defendants

233.   Plaintiffs incorporate all paragraphs, as though fully set forth herein.

234.   Defendants' conduct as alleged herein violated Plaintiffs' statutory rights under the federal Adoption Assistance and Child Welfare Act of 1980, as amended by the Adoption and Safe Families Act of 1997, 42 U.S.C. § 671 et seq., and the regulations promulgated under the Act, 45 C.F.R. Parts 1355-1357.

235.   At all times, each of the Defendants was acting under color of state law in the performance of his or her official duties.

236.   Defendants' acts and omissions alleged herein constitute a policy, pattern, practice, custom, final policymaking act, and/or ratification of a subordinate or agent's action that deprived Plaintiffs of their statutory rights.

237.   Defendants' acts and omissions complained of herein have caused the violation of Plaintiffs' statutory rights and caused Plaintiffs to suffer damages, including significant physical and emotional harm, in an amount to be determined at trial. These damages are compensable pursuant to 42 U.S.C. § 1983.

238.   As described herein, Defendants' acts or omissions were in willful, malicious, wanton, reckless or callous disregard of Plaintiffs' rights, thereby entitling Plaintiffs to punitive and exemplary damages.

## SIXTH CLAIM FOR RELIEF
### VIOLATION OF CIVIL RIGHTS (42 U.S.C. § 1983)
### Unconstitutional Policy, Custom, or Procedure (*Monell*)
### Against County of Los Angeles, DCFS, and Nichols

239. Plaintiffs incorporate all paragraphs, as though fully set forth herein.

240. This cause of action arises under 42 U.S.C. § 1983, wherein Plaintiff seeks to redress a deprivation under color of law of a right, privilege, or immunity secured to them by the First and Fourteenth Amendments to the United States Constitution.

241. Defendant County, by and through DCFS, and its agents and employees, violated Plaintiffs' constitutional rights, as alleged *supra*, by creating and maintaining the following unconstitutional customs and practices, inter alia:

    a.   Plaintiffs allege that Defendants have a *de facto* policy, custom, and/or practice of not protecting medically fragile children in its foster care system form harm;

    b.   Plaintiffs allege that Defendants have a *de facto* policy, custom, and/or practice of not conducting necessary and adequate supervision of its resource parents and affiliates;

    c.   Plaintiffs allege that Defendants have a *de facto* policy, custom, and/or practice of not conducting investigations regarding allegations of abuse or neglect against its resource parents;

d.      Plaintiffs allege that Defendants have a *de facto* policy, custom, and/or practice of not conducting investigations of multiple emergency room visits and hospitalizations for severely dehydrated children in foster care;

e.      Plaintiffs allege that Defendants have a *de facto* policy, custom, and/or practice of failing to hold DCFS resource parents to the same standards that it holds biological parents;

f.      Plaintiffs allege that Defendants have a *de facto* policy, custom, and/or practice of disregarding statutory obligations for designating children with special medical needs within the medical fragile unit and ensuring the requisite conditions are met and followed;

g.      Plaintiffs allege that Defendants have a *de facto* policy, custom, and/or practice of disregarding statutory obligations for reviewing and determining requests to place children with relatives of the child;

h.      Plaintiffs allege that Defendants have a *de facto* policy, custom, and/or practice of disregarding statutory obligations regarding case plans for foster children;

i.     Plaintiffs allege that Defendants have a *de facto* policy, custom, and/or practice of disregarding the best interests of the child;

j.     Plaintiffs allege that Defendants have a *de facto* policy, custom, and/or practice of intentionally and/or willfully disregarding the sanctity and rights of a familial relationship; and

k.     Plaintiffs allege that Defendants have a *de facto* policy, custom, or practice of inadequately monitoring and/or investigating the misconduct of its resource families.

242. Defendants' policies or customs caused and were the moving force and/or affirmative link behind some or all of the violations of Plaintiffs' constitutional and statutory rights at issue in this case.

243. Plaintiffs are informed, believe, and thereupon allege that these policies, practices, customs, and procedures are intentional and/or the result of deliberate indifference on the part of Defendants, by and through its decision makers.

244. The foregoing unconstitutional customs and practices were a direct and legal cause of harm to Plaintiffs.

245. Plaintiffs specifically allege that Defendants' policy, custom, and/or practices, as described herein, were within the control of Defendant County and

DCFS and within the feasibility of Defendants, to alter, adjust, and/or correct so as to prevent some or all of the unlawful acts and injury complained of herein by Plaintiffs.

246.   Further, Defendants failed in its duties to properly hire, train, instruct, monitor, supervise, evaluate and investigate Defendants' caseworkers and supervisors. Defendants were deliberately indifferent to the obvious consequences of these failures, and these failures directly resulted in the deprivation of Plaintiffs' constitutional and statutory rights.

### SEVENTH CLAIM FOR RELIEF
### VIOLATION OF CIVIL RIGHTS (42 U.S.C. § 1983)
### Failure to Train, Supervise, Discipline, or Correct
### (*City of Canton & Larez*)
### Against County of Los Angeles, DCFS, and Nichols

247.   Plaintiffs incorporate all paragraphs, as though fully set forth herein.

248.   This cause of action arises under 42 U.S.C. § 1983, wherein Plaintiff seeks to redress a deprivation under color of law of a right, privilege, or immunity secured to him by the First and Fourteenth Amendments to the United States Constitution and statutory violations.

249.   LOS ANGELES COUNTY, DCFS and BRANDON T. NICHOLS, Director of DCFS, violated Plaintiffs' constitutional rights, as alleged *supra*, by

creating and maintaining the following unconstitutional customs and practices, inter alia:

    a.   Plaintiffs are informed, believe, and thereupon allege that LOS ANGELES COUNTY, DCFS and BRANDON T. NICHOLS, Director of DCFS, individually and collectively have and had ample reason to know that its social workers were not providing sufficient evidence or were misrepresenting evidence related to imminent injury to children for placement determinations;

    b.  Plaintiffs are informed, believe, and thereupon allege that Defendants LOS ANGELES COUNTY, DCFS and BRANDON T. NICHOLS, Director of DCFS, individually and collectively have and had ample reason to know that its social workers were not conducting sufficient, timely, and comprehensive placement decisions with respect to medically fragile foster children;

    c.  Plaintiffs are informed, believe, and thereupon allege that Defendants LOS ANGELES COUNTY, DCFS and BRANDON T. NICHOLS, Director of DCFS, individually and collectively have failed to properly train, supervise, and/or discipline employees, officers, managers, and supervisors within LOS

ANGELES COUNTY and DCFS as to the legal requirements, obligations, and protections applicable to persons set forth in the United States and California Constitutions and other laws; and

d. Plaintiffs allege that these failures amount to a *de facto* policy and are intentional and/or the result of deliberate indifference on the part of DCFS and BRANDON T. NICHOLS, Director of DCFS, LOS ANGELES COUNTY, DCFS and BRANDON T. NICHOLS, Director of DCFS, individually and collectively, by and through its decision makers. These include, but are not limited to LOS ANGELES COUNTY, DCFS, BRANDON T. NICHOLS, Director of DCFS, and their subordinates, including Defendant ACOSTA and Defendant GOWDY as necessary to further these improper policies, practices, customs, and procedures.

250.   The foregoing unconstitutional customs and practices were a direct and legal cause of harm to Plaintiffs.

251.   Defendants LOS ANGELES COUNTY, DCFS and BRANDON T. NICHOLS, Director of DCFS, individually and collectively acted in a supervisory capacity with respect to the incidents involving Plaintiffs. In that capacity, LOS

ANGELES COUNTY, DCFS and BRANDON T. NICHOLS, Director of DCFS, acted intentionally, maliciously, and in conscious disregard, and/or with deliberate indifference to the rights of Plaintiffs.

252.    These supervisory failures of Defendants LOS ANGELES COUNTY, DCFS and BRANDON T. NICHOLS, Director of DCFS, directly caused and contributed to Plaintiffs' damages.

253.    Plaintiffs specifically allege that Defendants LOS ANGELES COUNTY, DCFS and BRANDON T. NICHOLS, Director of DCFS, policy, custom, and practice, as described *supra*, was within each of their control, and within the feasibility of each of them, to alter, adjust, and/or correct so as to prevent some or all of the unlawful acts and injury complained of herein by Plaintiffs.

### EIGHTH CLAIM FOR RELIEF
**CALIFORNIA CONSTITUTION, Cal const. Art. I, § 7(a)**
**(Substantive Due Process)**
**Against Defendants**

254.    Plaintiffs incorporate all paragraphs, as though fully set forth herein.

255.    This cause of action arises under the Constitution of the State of California, Article I, §7, which provides: "A person may not be deprived of life, liberty, or property without due process of law…"

256.   These rights include a right to be free from harm and an affirmative duty to protect from harm while involuntarily in government custody and a right to medical treatment, services, and care provided through the exercise of accepted, reasonable, and professional judgment.

257.   Defendants' actions and omissions complained of herein constitute a policy, pattern, practice, custom, final policymaking act, and/or ratification of a subordinate or agent's action that deprived Plaintiffs of their statutory rights.

258.   Defendants' acts and omissions complained of herein have caused the violation of Plaintiffs' constitutional rights and caused Plaintiffs to suffer damages, including significant physical and emotional harm, in an amount to be determined at trial.

259.   Plaintiffs are entitled to injunctive relief against Defendants' conduct as described herein because Plaintiffs may suffer and continue to suffer substantial and immediate irreparable injury from such conduct unless and until Defendants are restrained.

260.   As described herein, Defendants' acts or omissions were in willful, malicious, wanton, reckless or callous disregard of Plaintiffs' rights, thereby entitling Plaintiffs to punitive and exemplary damages.

## NINTH CLAIM FOR RELIEF
### NEGLIGENCE
### Against Defendants

261.    Plaintiffs incorporate all paragraphs, as though fully set forth herein.

262.    This cause of action arises under the general laws and Constitution of the State of California.

263.    Plaintiffs have complied with the California Tort Claims Act.

264.    For purposes of this claim for relief, allegations are deemed to sound in negligence, and set forth pursuant to Cal. Civ. Code § 1714.

265.    In performing all of the complained of acts and omissions throughout this Complaint by way of their conduct, defendants, and each of them, have breached the duty to act reasonably under the circumstances described.

266.    Defendants created a special relationship with respect to Baby Erick and Plaintiffs as a result of DCFS' custody of Baby Erick. As a result, they owed a special relationship duty of care and to protect Baby Erick from harm.

267.    As a direct and proximate result of the foreseeable conduct throughout this Complaint, plaintiffs have suffered and continue to suffer great emotional pain and injury, all in an amount to be determined according to proof at trial.

## <u>TENTH CLAIM FOR RELIEF</u>
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### Against Defendants

268.   Plaintiffs incorporate all paragraphs, as though fully set forth herein.

269.   As outlined in detail above, Defendants and their agents conduct was outrageous, particularly the actions and omissions taken by Defendant ACOSTA and/or DCFS resource parent Nsubuga with respect to Plaintiffs' newborn and medically fragile baby, including, but not limited to, removal of Baby Erick from the NICU without prior notice and information to Plaintiffs; the intentional and deliberate attempts to wrongfully limit Plaintiff SUMOYYAH LEE's access to Baby Erick; denial of repeated requests for placement of Baby Erick with Plaintiffs' family; misrepresentations to Plaintiffs regarding the purposes and reasons for Baby Erick's multiple hospitalizations for severe dehydration and kidney failure as a result of severe dehydration; and callous, evil failure to inform Plaintiffs of the death of their infant baby for more than 24 hours.

270.   Defendants were aware or should have been aware of the potential severe and negative effects of their actions and omissions, misrepresentations, and disregard for their obligations related to Plaintiffs and Baby Erick's removal, foster care, and death.

271. No reasonable person could characterize Defendants actions as anything but outrageous.

272. Defendants' actions were reckless, at a minimum, and were intended to cause emotional distress to Plaintiffs or a deliberate, reckless and/or willful disregard of the emotional distress to Plaintiffs.

273. No reasonable person, particularly purportedly trained social workers and special needs resource parents would believe that such actions, omissions, and misrepresentations were in the best interest of Baby Erick or related to the principle of family reunification.

274. Plaintiffs have suffered and continue to suffer severe emotional distress from Defendants' actions, omissions, and misrepresentations.

275. Defendants' actions, omissions, and misrepresentations caused Plaintiffs individually and collectively to suffer ongoing and severe anxiety, depression, guilt, anger, grief, shame, and humiliation.

## ELEVENTH CLAIM FOR RELIEF
### WRONGFUL DEATH
### (Cal. Civ. Code, §377.60 *et seq.*)
### Against Defendants

276. Plaintiffs incorporate all paragraphs, as though fully set forth herein.

277. This cause of action is brought under Cal. Code of Civ. Pro. § 377.60, for the wrongful death of Decedent, Erick A. Lee or "Baby Erick", which was

caused by the willful, reckless, and negligent acts and omissions of all the Defendants herein.

278.   Sometime before and including May 4, 2022, Defendants CDSS, COUNTY OF LOS ANGELES, DCFS, BRANDON T. NICHOLS, Director of DCFS, and their subordinates, including Defendant ACOSTA and Defendant GOWDY, and DOES 1-50 breached the various duties owed to Decedent while providing inadequate foster care services in the County of  Los Angeles, California, including the duty to investigate, inspect, evaluate, hire, train and/or supervise those charged with the care of Decedent, a newborn premature medically fragile infant who spent 101 days in the custody and care of Defendants' designee and DCFS resource parent, Nsubuga.

279.   Upon Baby Erick's discharge from the NICU on or about June 28, 2022, Defendants recklessly and negligently allowed DCFS resource parent Nsubuga to be designated as the resource parent for Baby Erick because of her purported specialized training and qualifications as a registered nurse. However, DCFS resource parent Nsubuga and/or her affiliates lacked the adequate training and supervision by Defendants.

280.   Baby Erick was a medically fragile child who required frequent feedings and care given his prematurity and low weight. The negligent and

reckless acts and omissions of the Defendants and DCFS resource parent Nsubuga proximately caused Baby Erick's death on October 7, 2022

281. Defendants had a special relationship with Baby Erick and a special duty to protect and provide professional foster care services to Baby Erick by highly qualified personnel. The acts of negligence, recklessness, and gross incompetence apply equally to all Defendants.

282. Such reckless acts and omissions by Defendants have caused the Plaintiffs, SUMOYYAH LEE and ERICK J. LEE, to suffer the loss of their son's society, love, comfort, affection, companionship, and other pecuniary losses.

283. The negligent and reckless acts and omissions of all of the Defendants have caused Plaintiffs SUMOYYAH LEE and ERICK J. LEE, to suffer a permanent and insurmountable loss of their son, and the permanent loss of their son's love, affection, comfort, protection, society, and companionship according to proof.

284. Defendants' actions, omissions, and incompetencies have caused Plaintiffs SUMOYYAH LEE and ERICK J. LEE, to suffer ongoing and severe anxiety, depression, guilt, anger, grief, shame, and humiliation.

## TWELFTH CLAIM FOR RELIEF
## CALIFORNIA PUBLIC RECORDS ACT
### (Cal. Gov. Code, § 6259 *et seq.*)
### Against Defendant County and DCFS

285.   Plaintiffs incorporate all paragraphs, as though fully set forth herein.

286.   Defendant County has improperly withheld public records Plaintiffs requested and are entitled to under Cal. Gov. Code §6259.

287.   On November 9, 2022, Plaintiffs, through their undersigned counsel, made a public records request in accordance with California Public Records Act, Gov't Code §§ 6250 et seq. ("PRA").

288.   The PRA request included all records subject to disclosure under the PRA related to Plaintiffs and Baby Erick, including, but not limited to, all investigative reports, DCFS files DCFS files and documents, photographic, audio, and video evidence; transcripts or recordings of interviews, personnel files, and all materials compiled by any law enforcement agency. Additional documents, such as the Declaration in Support of Access to and Copies of Juvenile Records was completed and submitted and a Request for Disclosure of Juvenile Case File (JV-570) was filed with the juvenile court. To date, no documents have been produced.

289.   Defendant DCFS rejected the PRA request under Cal. Welf. & Inst. Code § 827(a)(1).

290.   However, at a minimum, any investigative documents related to Baby Erick's death and the personnel file of involved social workers should have been produced, with applicable redactions if any.

291.   Defendant County and DCFS are delaying complete and timely production of relevant responsive public records documents beyond Plaintiffs' statute of limitations for timely filing state causes of action against the County in violation of its obligations under the California PRA, Cal. Gov. Code §6259 *et seq*.

292.   Over the course of ten (10) months, Defendants have failed to produce to Plaintiffs complete and timely disclosure of certain public records related to the Plaintiffs' PRA request.

293.   To date, Defendants have not produced any documents.

294.   Defendant County's improper delays and withholding of responsive documents is in violation of Cal. Gov. Code §6253 *et seq*.

## VII.  <u>PRAYER FOR RELIEF</u>

**WHEREFORE**, Plaintiffs pray for the following relief from Defendants, and each of them, for each of the above causes of action:

(i)    Compensatory damages, including general and special damages, according to proof;

(ii)     Punitive damages pursuant to 42 U.S.C. §1983 and California Civil Code § 3204, 52.1(b), and Cal. Pen. Code §502(e)(4), and any other applicable laws or statutes, in an amount sufficient to deter and make an example of each Defendant;

(iii)    Exemplary damages in accordance with Cal. Civ. Code, §1798.53, and any other applicable provisions;

(iv)    Statutory damages, according to proof;

(v)     Prejudgment interest according to proof;

(vi)    Reasonable attorney fees pursuant to 42 U.S.C. §1983, 1988; California Civil Code §§ 52.1, 52(b)(3); California Code of Civil Procedure 1025.1, Cal. Gov. Code, §6259(d), and Cal. Civ. Code, §1798.45-1798.48, and any other applicable provisions;

(vii)   Costs of suit and litigation;

(viii)  Injunctive relief;

(ix)    Vicarious liability, where applicable, pursuant to Cal. Gov. Code §815.2; and

(x)     Such further relief which is just and proper.

This 21st day  of August, 2023.

Je Yon Jung
Je Yon Jung
**May Jung LLP**
333 City Blvd. West
Suite 327
Orange, CA 92868
(818) 869-6476
jeyon@mayjung.com

*Attorney for Plaintiffs*

## DEMAND FOR JURY TRIAL

Plaintiffs respectfully request a trial by jury as to all matters so triable.

This 21st day of August, 2023

Je Yon Jung
Je Yon Jung
**May Jung LLP**
333 City Blvd. West
Suite 327
Orange, CA 92868
(818) 869-6476
jeyon@mayjung.com

*Attorney for Plaintiffs*

COMPLAINT
PAGE 77